## THE CLIFFORD.
## THE SENATOR RICE.
## THE HERCULES.
## THE LEXINGTON.

District Court, S. D. New York.
June 24, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (Mr. Vandercliff, of counsel), for libelant L. R. Connett & Co.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (Robert S. Erskine, of New York City, of counsel), for libelant Cornell Steamboat Co. and for the Senator Rice and the Hercules.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark, of New York City, of counsel), for the Lexington.

FRANK J. COLEMAN, District Judge.

On October 20, 1927, at about 5:55 p. m., the passenger steamer Lexington, bound from New York to Providence via Long Island Sound, came into collision with the scow Clifford in the East River, causing it serious damage. The Clifford was in tow of the two tugs Senator Rice and Hercules. The owner of the Clifford has brought suit against the two tugs and the steamer while the owner of the tug Senator Rice has brought suit against the steamer on the ground that the collision caused the scow to bump into the tug Senator Rice causing the latter some injury. There is, however, no evidence that any such injury was sustained and I therefore dismiss the libel of the Cornell Steamboat Company v. the Steamship Lexington.

The collision occurred in the lower part of the East River near the Battery at about 500 feet off the end of Pier 5. The Lexington had rounded the Battery on the outside of a dredge anchored about 500 feet off South Ferry and after straightening up the river was proceeding at a distance of about 500 feet from the Manhattan pier ends. The tow, which consisted of three light barges in tandem drawn by two powerful tugs, had come down the Brooklyn side of the East River and was intending to pass between the anchored dredge and South Ferry. The exact course that the tow had followed prior to the collision is in dispute, but when it was about 500 feet off the end of pier 4 or pier 5 the steamer came in contact with the Clifford

which was the first tier of the tow and stove in her port side breaking every plank in it. After the collision the steamer was headed across stream at about right angles to the course she had been on, her bow pointing in toward pier 5 on the Manhattan shore.

The men on the tugs testified that they had been proceeding parallel to the Manhattan pier ends and about 400 or 500 feet off with the tow approximately in line when the steamer first rounded the anchored dredge about half a mile distant. They testified that, as the steamer approached, she showed only her red light, and that there was ample room for a port to port passing; when, however, she was 300 or 400 feet distant, she reversed her engines and turned almost at right angles to port heading directly in toward the Manhattan shore; and that, the tugs being unable to stop the tow, ported their helm and increased their speed so as to pull the tow closer to the Manhattan pier ends. The stem of the steamer came into contact with the first scow about amidships and the angle of contact was a little less than 90°.

The only possible explanation the tug men could give for the steamer suddenly turning at right angles to her course was that in reversing her engines her bow was naturally thrown to port. Their only explanation of why she should have reversed her engines in view of their claim that there was ample room for a port to port passing is that there was a car float off the port side of the tow which may have obstructed the steamer's course. I find both of these explanations to be groundless surmises on the part of those witnesses. In the first place as to the effect of reversing, I am absolutely convinced that it would tend to throw the bow to starboard instead of to port, and that whatever brought the steamer around had that effect in spite of the reversing. Furthermore, in regard to the presence of the car float, it was not only indefinitely located, but the witnesses stated contradictory and impossible things about its course. The car float which they refer to was probably the one mentioned by the witness Dillon which could not have been in a position to obstruct the Lexington.

The testimony of the Lexington's witnesses, on the other hand, was that, when she straightened out abreast of the dredge, the two green lights of the tugs were visible at about the center of the river off pier 10 leaving ample room for a starboard to starboard passing; that the steamer sounded two blasts which the tugs failed to answer; which were repeated and again unanswered; that

thereupon the tugs closed in their green lights and displayed their red .indicating a change of course so as to cross the steamer's bow; that the steamer thereupon reversed her engines losing her headway and remaining approximately headed up stream. They testified that the tugs, having gotten past the steamer's bow, pulled somewhat down stream causing the first scow to come into contact with the stem of the steamer and to haul the steamer's bow to port so that it headed as found after the collision toward the Manhattan shore.

It is hard to reconcile either version with the probabilities. The tug men leave absolutely inexplicable the turning of the steamer toward the Manhattan shore because the reversing of her engines would have had the exact opposite effect. It is inconceivable that her master did it deliberately, and, on the other hand, the tide was not sufficient to have done it, because it was almost slack water. The most reasonable explanation is that of the steamer's witnesses that she was pulled around by the contact with the barge. This would presuppose that the course of the tow was across that of the steamer and would therefore corroborate the steamer's witnesses as to the tow's course.

The tug's .counsel, however, urges that such contact as this would not have caused the sharp deep penetration of the scow's side in which every plank was broken and which had the effect of shoving her opposite side out of line. It may be that this contention would, be sound if the steamship were absolutely stationary at the time of the contact, but her witnesses may have been mistaken and she may not have lost all her headway at the time of the contact.

It is hard to see why the tugs should have undertaken the maneuver described by the steamer's witnesses in view of the latter's statement that it could not possibly succeed. According to them, it was so foolhardy as to conflict with the probabilities. However, inattention and misjudgment may, after the event, seem like improbable foolhardiness. Those in charge of the tow had the intention to pass between the dredge and South Ferry, and, if they had too long continued on the Brooklyn side of the river or even near the middle of the river, a rather sharp turn toward the Manhattan shore would have been necessary, and they might have taken it without due regard for the approaching steamer.

In considering the probability of the steamer's contention that she was pulled athwart the stream by the tow, it should be borne in mind that the tugs were powerful and that they had a light tow. The steamer was 243 feet long and may have had some headway of her own.

At the trial the men from the tugs did not impress me as favorably as those from the steamer, and, upon reading their testimony, the impression has been confirmed. The testimony of the men from the tugs is full of inconsistencies and contradictions. There is one rather significant admission in the testimony of the master of the Senator Rice, which was the principal tug, in that he said he heard a two-blast signal from the steamer, but, assuming that it was for some other craft, he directed his pilot to disregard it. In view of the steamer's evidence, I believe the signal was intended for the tow, and that it would not have been given unless the tow was in the position and on the course claimed by the steamer.

In view of all the circumstances, I find that the tug Senator Rice, which was in charge of the tow, was negligent in following the course it did in view of the approaching steamer and in disregarding the latter's signals. Furthermore, I exonerate the steamer of negligence. While she unquestionably was on the wrong side of the river, the testimony is uncontradicted that other craft in the vicinity of the dredge prevented her from going more to the Brooklyn shore. Also, if the finding is correct as to the position of the tow when the steamer straightened up the river, it would have been impossible for her to proceed toward Brooklyn because its green lights indicated a course down the middle of the river. The steamer's speed was not excessive, because I find that it was about 5 or 6 miles an hour. The tide was in the last 50 minutes of the flood, and even at its full strength was only 1.2 knots an hour in that locality. Settle decrees accordingly.